IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| ZURICH AMERICAN INSURANCE COMPANY AND FIDELITY AND DEPOSIT COMPANY OF MARYLAND, | CV 21-95-BLG-TJC |
| Plaintiff, | **ORDER** |
| vs. | |
| MITCHELL B. GOLDSTEEN, et al., | |
| Defendants. | |

Plaintiff Zurich American Insurance Company and Fidelity and Deposit

Company of Maryland ("Zurich") brings this action against Defendants Mitchell B.

Goldsteen and Kimberly D. Goldsteen (the "Goldsteens"); CMG AC, LLC; CMG

MCE, LLC; CMG AC, LLC d/b/a CMG Construction, LLC (collectively the

"CMG Entities"); FirstMark Group, LLC; FirstMark Construction, LLC d/b/a

FirstMark Foundations, LLC d/b/a CMG Constructions, LLC; FirstMark

Equipment, LLC p/k/a CMG MCE, LLC; FirstMark Materials, LLC p/k/a CMG JL

LLC; FirstMark REJL, LLC p/k/a CMG REJL, LLC; and FirstMark RETC, LLC

p/k/a CMG RETC, LLC (collectively, the "FirstMark Entities," and with the

Goldsteens and CMG Entities, the "Defendants").  Zurich, as surety, alleges that

1

Defendants breached their contracts with Zurich and seeks specific performance and damages.  (Doc. 1.)

Presently before the Court is the Goldsteens' Motion for Summary Judgment (Doc. 25) and Zurich's Motion for Summary Judgment (Doc. 29.)  The motions are fully briefed and ripe for the Court's review.  (Docs. 26, 30, 38, 40, 47, 49.)

Having considered the parties' submissions the Court orders that the Goldsteens' Motion for Summary Judgment (Doc. 25) is **GRANTED in part and DENIED in part**, and Zurich's Motion for Summary Judgment (Doc. 29) is **GRANTED in part and DENIED in part**.

## I.     Background[1]

CMG Construction, Inc. was a construction company based in Billings, Montana.  Defendant CMG AC, LLC, purchased the assets of CMG Construction, Inc. in February 2017.[2]

Zurich is a company that provides financial and performance guarantees in the form of surety bonds for the construction industry.  The CMG entities obtained a number of payment and performance bonds from Zurich for construction projects in Montana.  Several agreements were signed in connection with the bonds.

---

[1] The background facts set forth here are taken from the parties' submissions and are undisputed unless otherwise indicated.

[2] CMG Construction, Inc. is not related to Defendant, CMG Construction, LLC, in this matter.

First, on September 28, 2018, Mitchell Goldsteen signed a General

Indemnity Agreement ("GIA") with Zurich on behalf of, and in his capacity as

member manager of, the CMG Entities.  (Doc. 1-1.) [3]  The GIA generally requires

the indemnitors to indemnify and hold Zurich harmless from any liability and loss

arising from any bond issued by Zurich.  The GIA lists the CMG Entities and the

Goldsteens as indemnitors "in favor of Zurich . . . with respect to any bond . . . of

suretyship or guarantee executed, provided or procured . . . by [Zurich] . . . ."  (*Id.*)

Nevertheless, the Goldsteens did not sign the GIA in their individual capacities.

The same day, Mitchell and Kimberly Goldsteen signed a Net Worth

Retention Agreement ("NWRA") with Zurich in their individual capacities.  (Doc.

1-2.)  The purpose of the NWRA was to "assure the Indemnitor's ability to

discharge their obligations under any Bonds furnished by [Zurich] and under the

GIA."  (*Id.* at 1.)  The NWRA required the indemnitors to maintain a minimum net

worth of $15,000,000.  (*Id.*)  The NWRA is titled "Addendum No. 1," and states it

"is incorporated by reference therein to the Zurich . . . Surety Agreement of

Indemnity dated September 24, 2018,[4] by and between [Zurich] and [the CMG

Entities] (and contingent indemnitors Mitchell B[.] Goldsteen and Kimberly D.

---

[3] For consistency, the Court will refer to the page numbers generated by CM/ECF
on the documents, rather than the parties' own page numbers.

[4] The GIA is dated September 24, 2018.  (*See* Doc. 1-1 at 1.)  Mitchell Goldsteen
signed the GIA on behalf of the CMG Entities on September 28, 2018.  (*Id.* at 6.)

Goldsteen), collectively the Indemnitor(s) named therein (GIA)." (*Id.*)  The signature blocks to the NWRA also designate the Goldsteens as "contingent indemnitors." (*Id.* at 4.)

CMG AC, LLC, subsequently changed its name to FirstMark Group, LLC. On April 24, 2019, Mitchell Goldsteen, as member manager, signed a document titled "Rider Adding Additional Indemnitors to General Indemnity Agreement" ("Rider"), adding the FirstMark Entities as Indemnitors to the GIA.  (Doc. 1-3.) The Goldsteens did not sign the Rider in their individual capacities.

Later, in 2020, the FirstMark Entities became involved in a dispute with the former owner of the company, CMG Construction, Inc., concerning the original 2017 purchase of the company.  The dispute was submitted to arbitration, and resulted in an award against the FirstMark Entities for approximately $12,500,000. In September 2020, the FirstMark Entities and CMG Construction, Inc., negotiated a settlement agreement that provided for a multi-year payment plan by the FirstMark Entities, and a reduction in the total payment due to CMG Construction, Inc.

The FirstMark Entities subsequently defaulted under the settlement agreement.  Therefore, in May 2021, the FirstMark Entities and CMG Construction, Inc., entered into a second settlement agreement, which provided for

the transfer of assets by the FirstMark Entities to CMG Construction, Inc., in satisfaction of the sums owing under the settlement agreement.

On June 7, 2021, Zurich sent a letter notifying the Goldsteens that, in its view, the transfer of FirstMark's assets to CMG Construction, Inc., violated the GIA and NWRA. (*See* Doc. 30-14.) The letter further notified the Goldsteens that they had failed to timely provide "CPA-Prepared Reviewed Financial Statements of Indemnitors" for the year 2020, as required by the GIA and NWRA. (*Id.* at 2-3.) Last, the letter maintained that the settlement agreement with CMG Construction, Inc., reduced Defendants' Tangible Net Worth below the Minimum Required Tangible Net Worth, as set forth in the NWRA. (*Id.* at 3.) For these reasons, according to Zurich, Defendants were in default under the terms of the GIA and NWRA. The letter requested that Defendants provide the financial statements and collateral in the amount of $7,000,000 within ten days of receipt of the letter, or Zurich would file suit.

Since the June 2021 letter, Zurich alleges it has incurred over $6,000,000 in losses in satisfying Defendants' bond claims. (Doc. 31 at ¶¶ 19, 20, 22, 23, 25.) Defendants dispute Zurich's alleged losses. (Doc. 41 at ¶¶ 21, 22, 24, 25, 27.) It is undisputed, however, that Defendants have not reimbursed Zurich for any of the

bonded claims.  (*See* Docs. 31 at ¶ 21; 41 at ¶ 23.)  Zurich also alleges that

Defendants have not provided Zurich with the requested financial statements.[5]

On September 7, 2021, Zurich filed the instant action.  Zurich's Complaint

alleges six causes of action: (1) breach of contract; (2) common law

indemnification against the FirstMark Entities; (3) specific performance on the

provisions of the GIA, NWRA, and Rider and a lien "no less than" $7,000,000; (4)

*quia timet*; (5) unjust enrichment; and (6) declaratory relief with respect to

Zurich's losses under the bonded projects.  (*See* Doc. 1.)

The Goldsteens now move for summary judgment on Zurich's claim for

breach of contract and claims in Counts 3, 4, 5, and 6.  (Doc. 25.)  Conversely,

Zurich moves for summary judgment on its breach of contract claim against all

Defendants and seeks damages and specific performance.  (Doc. 29.)

## II.   Legal Standard

Summary judgment is appropriate where the moving party demonstrates the

absence of a genuine issue of material fact and entitlement to judgment as a matter

of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).  Material facts are those which may affect the outcome of the case.

---

[5] This is somewhat unclear from the record.  From what the Court can gather, it is
undisputed that Zurich's June 7, 2021, letter requested CPA-Prepared Reviewed
Financial Statements of Indemnitors for 2020, and there is no indication that the
financial statements have been given to Zurich.  (*See* Docs. 31 at ¶ 18; 41 at ¶ 20.)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable factfinder to return a verdict for the nonmoving party. *Id*. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. "When the moving party would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Trans. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). If the moving party fails to meet its initial burden, "summary judgment must be denied even if no opposing evidentiary matter is presented." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970) (internal quotations omitted). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and . . . by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there

7

is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252).

When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## III. Discussion

### A. Breach of Contract Claim against the Goldsteens

Both parties move for summary judgment as to Zurich's breach of contract claim against the Goldsteens. A claim for breach of contract requires: (1) a contract, (2) a breach of an obligation under the contract, and (3) damages as a result of the breach. *King v. Recreational Equip., Inc.*, 2016 WL 8711411, at * 3 (D. Mont. Dec. 7, 2016). In Montana, the same rules apply to the interpretation of

8

a contract of suretyship as in the interpretation of other contracts.  Mont. Code Ann. § 28-11-403 (2021).

"The interpretation and construction of a contract is a question of law." *Krajacich v. Great Falls Clinic, LLP*, 276 P.3d 922, 926 (Mont. 2012).  "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."  *Corp. Air v. Edwards Jet Ctr.*, 190 P.3d 1111, 1120 (Mont. 2008) (quoting Mont. Code Ann. § 28-3-301).  The mutual intention of the parties "is to be ascertained from the writing if possible."  *Mary J. Baker Revocable Trust v. Cenex Harvest States, Coop.*, 164 P.3d 851, 857 (Mont. 2007).  "If the language of a contract is unambiguous—i.e., reasonably susceptible to only one construction— the duty of the court is to apply the language as written."  *Id.*  If, however, the language is ambiguous, "a factual determination must be made as to the parties' intent in entering into the contract."  *Id.*

Whether an ambiguity exists is also a question of law and is to be determined on an objective basis.  *Mary J. Baker*, 164 P.3d at 857.  "Where the words are clear, certain, and unambiguous, the language alone controls and there is nothing for the courts to interpret or construe."  *Morning Star Enter., Inc. v. R.H. Grover, Inc.*, 805 P.2d 553, 557 (Mont. 1991).  Thus, "[t]he intention of the parties must be ascertained, first and foremost from the writing alone."  *Morning Star*, 805

9

P.2d at 557.  While extrinsic evidence may not be used to contradict the terms of the contract, evidence relating to the circumstances of the contract may be considered.  *Mary J. Baker*, 164 P.3d at 857 (citing Mont. Code Ann. § 28-3-402) ("A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates.").

An ambiguity does not arise merely "'by the fact that the parties to a document, or their attorneys, have or suggest opposing interpretations of a contract, or even disagree as to whether the contract is reasonably open to just one interpretation.'"  *Mary J. Baker*, 164 P.3d at 857 (quoting 11 Williston on Contracts § 30:4, 51-54 (4th ed. 1999)).  Thus, an ambiguity exists only if the language is susceptible to two, or more, reasonable but conflicting meanings.  *Id.*  An ambiguity in a contract is generally construed against the drafter.  *Corp. Air*, 190 P.3d at 1121.

Here, the parties dispute whether: (1) the Goldsteens are subject to the terms of the GIA; (2) the extent of the Goldsteens' liability under the GIA and NWRA; and (3) whether the Goldsteens breached the GIA or NWRA.  The Court will address each in turn.

### 1.   *Whether the Goldsteens are subject to the GIA*

First, the parties dispute whether the Goldsteens are subject to the GIA.  The parties agree that the Goldsteens signed, and are parties to, the NWRA.  (Docs. 27

at ¶ 4; 39 at ¶ 4.)  But the Goldsteens argue that, because they did not sign the GIA in their individual capacities, they are not subject to the GIA.  Zurich contends the GIA and NWRA are one agreement, and by signing the NWRA, the Goldsteens are bound by the terms of the GIA.

When examined, it is clear the parties intended for the GIA and NWRA to exist and be construed as one document.  The GIA is numbered pages "1 of 11" through "7 of 11."  The NWRA is numbered pages "8 of 11" through "11 of 11," and is titled "Addendum No. 1."  (Doc. 1-2.)   On the first page of the GIA, the CMG Entities and Mitchell and Kimberly Goldsteen are listed as indemnitors. (Doc. 1-1.)  The GIA also references the NWRA and addresses the Goldsteens' indemnity obligation as follows:

> 29.     Indemnitors agree that the joint and several indemnity of Mitchell B. Goldsteen and Kimberly D. Goldsteen, individually, shall have no obligation to the Surety as prescribed under this Agreement unless and until a failure to cure an event of default under the Addendum No. 1, Net Worth Retention Agreement as set forth below.

(Doc. 1-1 at ¶ 29.)

The NWRA also explicitly provides that the "GIA is incorporated in this NW Agreement, as though fully set forth herein."  (Doc. 1-2 at ¶ 1.)  The NWRA refers to the Goldsteens as contingent indemnitors, and is signed by the Goldsteens in their individual capacities.  (*Id.* at 1, 4.)

"In [certain] limited situations, several instruments made at the same time in relation to the same subject matter may be read together as one instrument even where the parties are not the same." *Tin Cup Cty. Water and/or Sewer Dist. v. Garden City Plumbing & Heating, Inc.*, 200 P.3d 60, 67 (Mont. 2008) (citing *Doheny v. U.S. Fid. & Guar. Co.*, 34 F. Supp. 888, 890 (D. Mont. 1940)). "[W]here several instruments are made at the same time in relation to the same subject matter they may be read together as one instrument and the recitals in the one may be limited by reference to the other. This rule may obtain even when the parties are not the same if the several instruments were known to all parties and were delivered at the same time to accomplish an agreed purpose." *Doheny*, 34. F. Supp. at 890.

Here, the GIA and NWRA were executed on the same day; they relate to the same subject matter; and they are structured as one consolidated document. The GIA references the NWRA, and the NWRA expressly incorporates the GIA in full. It is clear the parties intended for the GIA and NWRA to be considered as one agreement.

The Goldsteens are thus subject to the terms of the GIA and NWRA, and partial summary judgment is appropriate as to this issue.

/ / /

/ / /

12

## 2.    The Goldsteens Liability under the GIA and NWRA

Next, the parties dispute the limit of the Goldsteens' liability under the GIA and NWRA.  The Goldsteens argue that, even if they are personally liable to Zurich, their liability is expressly limited in the NWRA to $1,000,000.  Zurich maintains, on the other hand, that because of the nature of the Goldsteens' alleged breach, the $1,000,000 cap does not apply.  The Court agrees with the Goldsteens.

The Goldsteens' personal liability to Zurich is expressly limited by provisions in both the GIA and NWRA.  First, as noted above, the GIA provides that the Goldsteens shall have no obligation to Zurich under the GIA unless there is a failure to cure an "event of default" under the NWRA.  (Doc. 1-1 at ¶ 29.)  The NWRA sets forth two events of default under paragraph 6 of the agreement, which provides:

> An event of default is when (i) Tangible Net Worth is less than the Required Minimum Tangible Net Worth determined by Surety analysis of the most recent CPA Review or Audited financial statement and a result of the actions in paragraph 4 above,[6] or (II) failure to provide to the Surety a fiscal year end CPA Review or Audited financial statement within 120 days of the most recent fiscal year end.

(Doc. 1-2 at ¶ 6.)

---

[6] Paragraph 4 of the NWRA prohibits any action which may cause a reduction of the indemnitors' net worth below the minimum required by the agreement, including any distribution of dividends, loans or transfers of assets, sale of assets, or assumptions of any obligation or liability.  (*Id.* at ¶ 4.)

Next, paragraph 8 of the NWRA, titled "Indemnity," expressly limits the

Goldsteen's liability under the GIA and NWRA, and provides:

> The indemnity and exoneration afforded the Surety pursuant to this NW
> Agreement is limited to the full reduction in Tangible Net Worth below the
> Minimum Required Tangible Net Worth based on Surety's analysis of the
> most recent CPA Review or Audited financial statement period and resulting
> from actions described in paragraph 4 above.  The indemnity of Mitchell B.
> Goldsteen and Kimberly B. Goldsteen under the GAI (sic) and this NW
> Agreement is limited to One Million Dollars ($1,000,000.00) triggered upon
> the Indemnitors failure to restore the minimum Required Minimum Tangible
> Net Worth set forth in paragraph 3 above within twenty 20 business days of
> a written demand by the Surety unless waived by the Surety in writing.  The
> foregoing indemnity limit shall be the aggregate liability of Mitchell B.
> Goldsteen and Kimberly B. Goldsteen during the term of the GAI (sic) and
> this NW Agreement.

(*Id.* at ¶ 8.)

Zurich urges a very narrow construction of this provision.  Zurich agrees that

the $1,000,000 liability cap is triggered upon failure to restore the minimum net

worth after demand by Zurich, but argues "[o]therwise, 'the indemnity and

exoneration . . . is limited to the full reduction in Tangible Net Worth below the

Minimum Required Tangible Net Worth'" as provided in the preceding sentence.

(Doc. 30 at 22, quoting Doc. 1-2 at ¶ 8.)  In other words, Zurich argues that the

liability limit only applies when the event of default is the failure to restore the

minimum net worth under the agreement, but does not apply to any other default.

Zurich comes to this conclusion by reversing the first and second sentence in the

provision, and inserting "otherwise" between the two sentences.

Zurich's reading is not persuasive.  When read sequentially, the first sentence in paragraph 8 states that indemnity is "limited to the full reduction in Tangible Net Worth below the Minimum Required Tangible Net Worth."  (Doc. 1-2 at ¶ 8.)  But the next sentence unambiguously limits the Goldsteens' liability: "[t]he indemnity of [the Goldsteens] under the [GIA] and this NW Agreement *is limited to One Million Dollars ($1,000,000.00)* . . . ."  (*Id.*)  Moreover, the third, and last, sentence in paragraph 8, makes clear that the liability cap is the combined limit for both Mitchell and Kimberly Goldsteen.  Thus, regardless of what event triggers the Goldsteens' liability, the NWRA unambiguously limits the Goldsteens' aggregate liability to $1,000.000.

The Court thus finds that the liability of the Goldsteens under the GIA and NWRA is limited to a total of $1,000,000, and summary judgment is appropriate as to this issue.

### 3.    Breach of the GIA and NWRA

Last, the parties dispute whether the Goldsteens breached the GIA and NWRA.  Zurich contends that both events of default in the NWRA trigger the Goldsteens' liability, and argues that the Goldsteens have breached the agreement under both events.  (Doc. 38 at 19.)  The Goldsteens counter that pursuant to paragraph 8 of the NWRA, their liability is triggered only by the first event of

default, failure to restore the Tangible Net Worth as a result of an action in paragraph 4. (Docs. 26 at 17; 49 at 7.)

Both parties' interpretations find support in competing provisions of the GIA and NWRA. The GIA provides that the Goldsteens are not obligated under the GIA "unless and until a failure to cure an event of default" under the NWRA. (Doc. 1-1, ¶ 29.) Pursuant to the NWRA, an event of default occurs when either: (1) because of actions set forth in paragraph 4 of the NWRA, the Tangible Net Worth is less than the minimum required amount; or (2) Defendants fail to provide Zurich fiscal year-end financial statements within 120 days of the most recent fiscal year end. (Doc. 1-2 at ¶ 6.) The language of the GIA, thus, leads to the conclusion that if the Goldsteens fail to cure *either* event of default, indemnity is triggered.

On the other hand, paragraph 8 of the NWRA states that the Goldsteens' indemnity obligation is triggered upon failure to restore the Tangible Net Worth to the minimum amount required within 20 days after written demand. (*Id.* at ¶ 8.) By the plain language of the NWRA, then, the Goldsteens' indemnity is only triggered by the failure to cure the first event of default.

Thus, paragraph 29 of the GIA and paragraph 8 of the NWRA conflict. Taken together, the foregoing provisions are susceptible to two reasonable but conflicting meanings. The Court, therefore, cannot state, as a matter of law, what

event(s) trigger the Goldsteens' indemnity obligation.  Summary judgment is thus

denied on this issue.  *See, e.g.*, *Corp. Air*, 190 P.3d at 1122 (finding contract to be

facially ambiguous, and thus summary judgment inappropriate, where provisions

in the agreement were "susceptible to two reasonable but conflicting meanings.").

*See also Vathana v. EverBank*, 770 F.3d 1272, 1277 (9th Cir. 2014) ("If the

wording is ambiguous, interpreting the contract involves a factual question and

summary judgment is inappropriate."); *Poore v. Simpson Paper Co.*, 566 F.3d 922,

927 (9th Cir. 2009) (reversing grant of summary judgment where contractual term

was ambiguous "[b]ecause resolving the ambiguity requires consideration of

disputed facts").

Further, there are disputed facts as to whether the Tangible Net Worth fell

below the Minimum Required Tangible Net Worth, or $15,000,000, because of an

action set forth in paragraph 4 of the NWRA.  (Doc. 1-2 at ¶ 3.)  Zurich argues the

settlement agreement with CMG Construction, Inc., reduced Defendants' Tangible

Net Worth from $21,813,418 to $4,549,951.  (Doc. 31 at ¶ 13.)  In support of this

contention, Zurich relies on the expert report of Jack Nicholson, CPA.  (Doc. 30-

19.)  Nicholson opines that Defendants failed to meet the Minimum Required

Tangible Net Worth in December 2020.  (*Id.* at 9.)

Conversely, the Goldsteens claim that the settlement agreement actually

increased Defendants' net worth.  (Docs. 41 at ¶ 15, 49 at 8.)  Defendants cite to

17

the expert report of Donald P. Keninitz, CPA.  (Doc. 42.)  Keninitz's report disputes Nicholson's report, and states "[t]he net effect of the Second Settlement [with CMG Construction, Inc.] was to increase FirstMark's tangible net worth by $10.1M."  (*Id.* at 10.)

Because there are competing expert reports that disagree as to whether the settlement agreement with CMG Construction, Inc., increased or decreased Defendants' net worth, there is a dispute of material fact and summary judgment is inappropriate.  *Direct Tech., LLC v. Electronic Arts, Inc.*, 836 F.3d 1059, 1067 (9th Cir. 2016) ("If [Zurich's expert] said one thing and [Defendants' expert] said another on the same subject, it is the role of the jury, not a court on summary judgment, to determine the facts.").  *See also Gregorini v. Apple, Inc.*, 2022 WL 4597419, at *5 (C.D. Cal. Aug. 26, 2022) ("[A] pair of competing, but admissible and otherwise credible, expert reports will almost necessarily introduce genuine issues of fact and thus preclude summary judgment.").

Zurich argues that Keninitz's report is based on speculation and not properly supported by the evidence, but weighing the evidence and evaluating the credibility of witness testimony are not functions of the Court on summary judgment.  *In re Barboza v. New Form, Inc.*, 545 F.3d 702, 707 (9th Cir. 2008).

### B.    Breach of Contract Claim against the CMG Entities and FirstMark Entities

Zurich also moves for summary judgment as to its breach of contract claim

against the CMG Entities and the FirstMark Entities.  In its response to Zurich's motion, Defendants' do not address Zurich's breach of contract claim against the CMG and FirstMark Entities.  Defendants only dispute the amount of Zurich's alleged losses.

There is no dispute as to the existence of a contract—the GIA and Rider—between Zurich and the CMG and FirstMark Entities.  Pursuant to the GIA, Defendants are obligated to "exonerate, indemnify, and hold Surety harmless from any and all liability and Loss, sustained or incurred, arising from or related to" any bond or claim.  (Doc. 1-1 at ¶ 2.)  In addition, Zurich has "the absolute and unconditional right" to resolve any claim made against Defendants.  (*Id.* at ¶ 3.)  Any settlement made by Zurich pursuant to a claim is "final, binding and conclusive upon Indemnitors.  Indemnitors shall remain bound under [the GIA] for all Loss even though any such Settlement or Modification by Surety does or might substantially increase the liability of Indemnitors."  (*Id.*)

Defendants present no argument in defense of Zurich's breach of contract claim against the CMG and FirstMark Entities.  Defendants do not dispute that Zurich received and settled claims on the bonded projects.  (Docs. 31 at ¶¶ 5, 20; 41 at ¶¶ 5, 22.)  It is also undisputed that Defendants have not reimbursed Zurich for any of the bond claims.  (Doc. 41 at ¶ 23.)  Defendants only dispute the amounts of damages Zurich has suffered on the bond claims.  (*Id.* at ¶ 22.)  T

Therefore, partial summary judgment is appropriate as to the existence of a contract between Zurich and the CMG and FirstMark Entities, and the breach of the same.

Nevertheless, Defendants argue that Zurich has failed to show the absence of genuine issues of material fact as to Zurich's claimed losses.  As of February 1, 2023, Zurich states it has "suffered damages under [the bond claims] in an amount of at least $6,480,239.24."  (Doc. 30 at 21.)  This number appears to be the sum of the bond claims, consulting fees, and attorney's fees.  (*See* Doc. 30-1 at ¶¶ 20, 28, 29, 32.)  In support, Zurich cites to the declaration of Marc Domres, a Zurich claim professional (Doc. 30-1), which in turn cites to a "Summary of Zurich's Losses (Doc. 30-15).

Defendants dispute Zurich's calculation of losses, asserting Zurich has not produced documents detailing the entirety of damages it seeks, and argue that the amounts listed are inconsistent with documents provided in discovery.  (Docs. 40 at 28; 41 at ¶ 22.)

The Court finds that Zurich has not met its initial burden of showing the absence of any genuine issue of material fact as to the amount of its losses.  It claims, for example, to have paid $6,120,502.01 on claims from FirstMark projects.  (Doc. 30-1 at ¶ 20.).  This appears to be based upon the Summary of Zurich's Losses filed in support of its summary judgment motion.  (Doc. 30-15.)

20

But the summary is not verified, and it does not state how it was prepared and whether it was prepared by someone with personal knowledge.  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

Additionally, Zurich has provided documentation as to some of the bond claims listed in its summary of losses, but certainly not all.  (*See, e.g.*, Doc. 47-1.) In fact, it appears that Zurich has provided documents related to only 9 of the 52 claims set forth in its loss summary.  The documentation is in the form of settlement agreements, emails, bills, and releases, most of which do not establish any actual payment by Zurich.  Moreover, none of the documentary evidence has been authenticated.  The Ninth Circuit has "repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment."  *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002).

Finally, Zurich asserts it "continues to accrue losses related to outstanding claims and as part of its efforts to enforce the [GIA]."  (Doc. 30-15 at 4.)  The payments shown in the loss summary constitute claims and attorney fees through January 24, 2003, and the total for consulting fees is through November 22, 2022. The Court has no way of knowing whether, and how much, these totals have

21

changed over the last several months, and what Zurich's damages claim may be at this time.

"A plaintiff will not be denied recovery simply because it is difficult to ascertain the amount of [its] damages, so long as the amount can be proven with a reasonable degree of certainty." *Sack v. A.V. Design, Inc.*, 683 P.2d 1311, 1315 (Mont. 1984) (citing *Smith v. Zepp*, 567 P.2d 923, 930 (Mont. 1977), *superseded on other grounds in Garretson v. Mountain W. Farm Bureau Mut. Ins. Co.*, 761 P.2d 1288, 1289 (Mont. 1988)).  Here, while there is no dispute that the CMG and FirstMark Entities are in breach of the GIA, the amount of losses Zurich incurred at this time have not been established, and cannot be computed with reasonable certainty at this juncture.  *Smith*, 567 P.2d at 930 (A plaintiff must provide the judge with "[a] reasonable basis for computation . . . to arrive at a reasonably close estimate of the loss.").

In conclusion, summary judgment is appropriate on the issue of whether the CMG Entities and the FirstMark Entities breached their agreements with Zurich. But Zurich's alleged losses have not been sufficiently established and, thus, must be determined by the trier of fact.  Accordingly, summary judgment as to damages is denied.

/ / /

/ / /

### C.    Specific Performance

 Zurich also moves for summary judgment on its claim for injunctive relief

and specific performance.  Zurich seeks $4,000,000 in collateral security pursuant

to the GIA.  Zurich argues that it contracted for "immediate protection from

anticipated Losses as a consequence of Zurich issuing the Bonds."  (Doc. 30 at 25.)

Defendants counter that Zurich's collateral request is unreasonable, and should be

denied, because it is arbitrary and made without factual support.

Paragraph 4, "Place In Funds," of the GIA provides:

> Indemnitors agree to promptly deposit with Surety, on demand, an amount
> of money that Surety determines is sufficient to fund any liability or Loss.
> Such funds may be used by Surety to pay Loss or may be held by Surety as
> collateral against potential future Loss.  Any remaining funds held by Surety
> after payment of all sums due to Surety under this Agreement shall be
> returned upon the complete release and/or discharge of Surety's liability
> under all Bonds.

(Doc. 1-1 at ¶ 4.)

"Specific performance is an equitable remedy which requires performance of

a contract based on the precise terms contained in the contract."  *Double AA Corp.*

*v. Newland & Co.*, 905 P.2d 138, 141 (Mont. 1995) (citing *Seifert v. Seifert*, 568

P.2d 155, 156 (Mont. 1977)).  Whether specific performance is appropriate,

depends on the facts and circumstances of the case.  *Seifert*, 568 P.2d at 157.  In

determining whether specific performance is appropriate, "the inquiry must be

whether, in equity and good conscience, the court should specifically enforce the

contract.  Accordingly, specific performance will be granted when it is apparent from a view of all the circumstances of the particular case that it will serve the ends of justice, and it will be withheld when, from a like view, it appears that it will produce hardships or injustice to either party . . . ."  *Seifert*, 568 P.2d at 157 (quoting 81 C.J.S. Specific Performance § 3).

Here, the terms of the GIA unambiguously require Defendants to post collateral that Zurich "determines is sufficient to fund" all liability or loss.  (Doc. 1-1 at ¶ 4.)  The issue then is whether specific performance of Zurich's collateral demand will serve the interests of justice or produce hardships or injustice for either party.

In support of its demand, Zurich cites to Mr. Domres' declaration, which simply states, "Zurich also has outstanding exposure of $4,000,000 related to unresolved payment and performance bond claims and reclamation bond claims." (Doc. 30-1 at ¶ 30.)  But Zurich does not provide any further explanation or evidence to support the basis for this claim.  Therefore, the Court cannot determine whether the demand is reasonable and well-supported, and whether the interests of justice would be served by granting Zurich's specific performance request.  The Court, therefore, denies summary judgment on Zurich's specific performance claim.

/ / /

### D.     The Goldsteens' Motion for Summary Judgment as to Counts 3, 4, 5 and 6.

Last, the Goldsteens move for summary judgment as to Zurich's claim for specific performance (Third Claim), *quia timet* (Fourth Claim), unjust enrichment – equitable liens (Fifth Claim), and declaratory relief (Sixth Claim).  Central to the Goldsteens' argument for summary judgment for each claim is the contention that the Goldsteens have no obligations under the GIA, and thus, Zurich cannot establish the aforementioned claims against them.  (*See* Doc. 26 at 20-23.)  As discussed above, however, the Goldsteens are subject to the terms of the GIA.  Accordingly, summary judgment as to claims 3, 4, 5, and 6 must be denied.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## IV.    Conclusion

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1.    The Goldsteens' Motion for Summary Judgment (Doc. 25) is **GRANTED** with respect to the limit of their liability under the GIA and NWRA; and **DENIED** in all other respects.

2.    Zurich's Motion for Summary Judgment (Doc. 29) is **GRANTED** with respect to (1) the existence of its contract with the Goldsteens under the GIA and NWRA; (2) the existence of its contracts with the CMG and FirstMark Entities; (3) the breach of the contracts by the CMG and FirstMark Entities; and **DENIED** in all other respects.

DATED this 31st day of August, 2023.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge